IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2026

**IN RE JAMES K.**

**Appeal from the Chancery Court for Henderson County**
**No. 28082     Steven W. Maroney, Chancellor**

_____

**No. W2025-01189-COA-R3-PT**

_____

In this termination of parental rights case, Appellant/Mother appeals the trial court's termination of her parental rights to the minor child on the ground of persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3). Because there is clear and convincing evidence to support this ground and the trial court's determination that termination of Appellant's parental rights is in the child's best interests, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

VALERIE L. SMITH, J., delivered the opinion of the court, in which JOHN W. MCCLARTY, P.J., E.S., and JEFFREY USMAN J., joined.

John Andrew Anderson, Lexington, Tennessee, for the appellant, Alexis K.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Alison E. Potterfield, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.[2]

---

[1] In cases involving the termination of parental rights, it is the policy of this Court to abbreviate the full names of the child and other parties to protect their identities.

[2] The Guardian Ad Litem did not file an appellate brief.

## OPINION

## I. Background

In November 2017, James K. (the "Child") was born to Appellant Alexis K. ("Mother"). DNA testing confirmed Tristan H. ("Father") to be the Child's father. This appeal concerns only Mother. In October and November 2020, the Tennessee Department of Children's Services ("DCS") received reports that the Child and his half sibling were experiencing environmental neglect and lack of supervision under Mother and Father's care. Specifically, it was alleged that, on November 19, 2020, the Child, who was nearly three years old, was found wandering outside of Mother's apartment complex. DCS met with Mother concerning the Child's supervision and potentially outfitting the apartment doors with alarms. Despite this meeting, five days later, the Child was found in the road and transported to a police station. That same day, the Juvenile Court of Henderson County (the "Juvenile Court") entered an order placing the Child in DCS' protective custody. On December 2, 2020, DCS filed a petition for dependency and neglect. Therein, DCS alleged that it had worked with Mother before concerning similar issues of environmental neglect and lack of supervision. DCS alleged that, despite providing services to the family, the home remained unsafe for the Child, he appeared unkempt, and that Mother failed to properly supervise him. At a hearing on February 23, 2022, the Juvenile Court found the Child dependent and neglected and ordered that he remain in DCS custody. In the years that followed, DCS developed several permanency plans for Mother and offered resources to help her regain custody of the Child.

On July 21, 2023, DCS filed a petition to terminate Mother's parental rights in the Chancery Court of Henderson County (the "trial court"). DCS alleged that the conditions that led to the Child's removal persisted and that termination was in the Child's best interest. On October 25, 2023, the trial court appointed a guardian ad litem (the "GAL") for the Child. On December 18, 2023, Mother filed an answer to the petition.

On February 12, 2025, the trial court heard the petition. The following witnesses testified: (1) Eilidh Seaton, the Child's therapist; (2) Alyssa Strahl, the Child's in-home care coordinator; (3) Yolande P. (the "Foster Mother"); (4) Mother; (5) Ashley Yeager, previous DCS case manager; and (6) Andrea Wilson, current DCS case manager.

On July 9, 2025, the trial court entered a lengthy order terminating Mother's parental rights.[3] As discussed further below, the trial court found that DCS met its burden to prove persistent conditions and that termination of Mother's parental rights was in the Child's best interest. Mother filed a timely notice of appeal.

## II. Issues

---

[3] This order also terminated Father's parental rights.

Mother raises two issues for review, as stated in her brief:

1. Did the [t]rial [c]ourt properly determine that the ground of Persistent Conditions as to [Mother was] proven by clear and convincing evidence?

2. Did the [t]rial [c]ourt properly determine, by clear and convincing evidence, that termination of parental rights was in the best interests of the [Child]?

## III. Standard of Review

"Parents have a fundamental constitutional interest in the care and custody of their children," which is guaranteed under both the United States and Tennessee constitutions. *In re Connor B.*, 603 S.W.3d 733, 788 (Tenn. Ct. App. 2020) (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2022)). This right is not absolute, however, and may be terminated if a court finds that one of the statutory grounds for termination exists and that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Statutory grounds for termination and a determination that termination is in the child's best interest must all be found by clear and convincing evidence, which "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Clear and convincing evidence "'establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Makendra E.*, No. W2015-01374-COA-R3-PT, 2016 WL 325481, at *2 (Tenn. Ct. App. Jan. 27, 2016) (alteration in original) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

In cases involving the termination of parental rights, the standard of appellate review differs slightly from general appellate review under Rule 13 of the Tennessee Rules of Appellate Procedure. The Tennessee Supreme Court has explained this heightened form of review as follows:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear

- 3 -

evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at \*7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

Second, appellate courts determine whether the combination of all the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at \*7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). Those seeking to terminate parental rights must prove the elements of their case by clear and convincing evidence, which includes the statutory grounds and the best interest of the child factors. *In re Carrington H.*, 483 S.W.3d 507, 523 (Tenn. 2016). Because of the nature of the consequences, proceedings to terminate parental rights require an individualized determination. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## IV. Analysis

### 1. Persistent Conditions

The sole ground on which the trial court relied to terminate Mother's parental rights is commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. Under Tennessee Code Annotated section 36-1-113(g)(3)(A),[4] this ground applies when

[t]he child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . ,

---

[4] The versions of the statutes referenced in this opinion were in effect when DCS filed its petition to terminate Mother's parental rights.

- 4 -

or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A). "The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B). It is undisputed that the Child was adjudicated dependent and neglected and had been removed from Mother's care for a few years when the trial court heard the termination petition.

In its final order, the trial court found that the conditions that led to the Child's removal were environmental neglect and lack of supervision. Specifically, the trial court cited the two incidents when the Child was found wandering outside of Mother's apartment complex, discussed *supra*. The trial court also found that Mother's housing was erratic and unstable such that, in all reasonable probability, it would cause the Child to be subjected to further abuse or neglect, to-wit:

11. . . . At the time of the February 12, 2025 hearing. Mother was living in a hotel with "plans" to move to an apartment in approximately one month. At the time of the hearing, Mother had been in the hotel for approximately three weeks. Prior to that time, Mother had lived from August of 2024 to January of 2025 in a trailer which is not safe for [the] Child. The trailer has appliances which need repair. Prior to that time, from February of 2024 through July of 2024, Mother lived in a tent (with occasional periods of living in a hotel) located behind Goodwill in Lexington, Tennessee. In other words, Mother was homeless. Prior to living in the tent, Mother lived with her (now deceased) mother in HUD housing. However, Mother was evicted from HUD housing because she was not actually on the lease.

12. Mother's housing has been erratic since the Child's removal. Her unstable situation makes it a reasonable probability that returning the Child to the care of Mother would be unsafe and would subject the Child to further abuse and neglect.

13. In further support of this conclusion, Mother is currently living with her fiancé, Shane []. [Shane] has a history of drug use, and according to Mother, "may be" on a "registry" of some sort. [Shane] had agreed to live elsewhere to prevent his being an obstacle to [the] Child being returned to Mother's care and custody.

The record supports these findings. Concerning her housing, Mother testified that she was "in transition" at the time of trial. Specifically, Mother was living in a hotel room with her fiancé, with plans to move to an apartment within one month. She testified that, the day before trial, she spoke with a landlord about an apartment. The record supports the trial court's finding that Mother was homeless for a period during these proceedings and also lived in a trailer. Mother admitted that neither of these situations were appropriate for the Child to be returned to. Mother also testified that she lived with her mother for an extended period and that she resided with friends for a few months. The record shows that Mother's own mother's home was not a suitable placement for the Child. Mother testified that she had been removed from her own mother's care and placed in foster care during her youth, prohibiting the Child's placement with her mother. Furthermore, Ms. Yeager, the Child's previous case manager, testified that she contacted Mother's own mother about her residence while Mother was living there, and Mother's mother stated that the home was not clean and that it was inappropriate for the Child to live there. Ms. Yeager also testified that, during her tenure as the Child's case manager from January 2023 through April 2024, Mother never obtained stable housing. Concerning Mother's fiancé, Shane, Mother testified that he had issues with drugs in the past. She also testified that "[t]here was a fact that was alluded to that he may be on" a juvenile registry, but she stated that she never asked him about these issues.

The trial court also found that Mother has "grappled with numerous mental health issues." Specifically, it found that she had been recently diagnosed with borderline personality disorder, for which she takes medication, and she had been hospitalized for mental health issues from January 7, 2025 through January 13, 2025, a few weeks before the termination hearing. The trial court found that the hospitalization was due to Mother's risk of self-harm, although Mother denied that self-harm was her intent. Mother's testimony supports these findings. Additionally, Mother testified that she had been previously diagnosed with bipolar disorder, PTSD, ADHD, anxiety, and depression. The trial court also found that Mother had "only has $134 to her name" and had been unemployed since October 31, 2024, because she was placed on leave due to a high-risk pregnancy. Mother testified that she was on leave for her high-risk pregnancy, that she had $134 in her bank account, and received $271 per month in short-term disability payments. Mother also testified that she had initiated a long-term disability claim, but that had not been processed at the time of trial. The trial court further found that Mother was on probation until May 2025 stemming from endangerment charges that were brought after the Child was found wandering in the street. Lastly, the trial court found that Mother tested positive for THC use in March 2022, after the Child's removal. The record supports these

additional findings.

The trial court found that there was little likelihood that the foregoing conditions would be remedied at an early date such that the Child could safely return to Mother's care. Specifically, the trial court found that

> Mother's erratic housing problems continue even to the present time, more than four years after [the] Child's removal. Although [Mother] asserts [] she has a plan to get this resolved within the next three to six months, the reality is there has been no actual manifested improvement beyond her intentions in the over four years that [the] Child has been removed. Further, her difficulties with housing and mental illness are not in the distant past but represent conditions that have been present even in the first six weeks of 2025.

As discussed above, the record supports these findings as Mother's housing had been unstable for a few years before the termination hearing and remained unstable as of the date of trial. While Mother may have *intended* to obtain stable and appropriate housing, she was never able to do so within the many years that the Child languished in foster care.

Lastly, the trial court found that the continuation of Mother's relationship with the Child greatly diminished his chances of early integration into a safe, stable, and permanent home. The trial court cited the fact that the Child had been removed from Mother's care over four years prior to the termination proceedings and had been "moved into more than one foster home" before being placed with his current foster family, with whom he had resided since October 27, 2023. Indeed, the record demonstrates that the Child had been placed in at least *seven* foster homes in the four years since he was removed from Mother's care. The trial court found that, during this time, Mother's visitation with the Child was "erratic" and accompanied by cancelations due to "Mother's action or inaction, and inattention by Mother during [the] visitations which did occur." The testimonies of Ms. Strahl, the Child's in-home care coordinator, Ms. Yeager, and Ms. Wilson, the Child's current case manager, support these findings. Ms. Strahl testified that she would facilitate Mother's supervised visitations with the Child. Her testimony demonstrates that, although the Child would be happy to see Mother for the visits, he did not share a deep bond with her, that Mother was often inattentive during the visits, and that the quality of the visitations never improved, despite Ms. Strahl providing Mother with some direction. Citing the issues with Mother's housing and mental health struggles, discussed *supra*, the trial court found that Mother "has shown no indication of being capable of establishing a safe, stable, and permanent home on her own such that [the] Child could be integrated into it." The trial court found that, "[t]hrough no fault of his own, [the] Child has been through upheaval for most of his young life," and that it was "time for this upheaval to cease." Accordingly, the trial court concluded that DCS met its burden of proof on the persistent conditions ground. We agree.

The persistent conditions ground focuses "on the *results* of the parent's efforts at improvement rather than the mere fact that he or she had made them," and analyzes whether the child could be returned to the parent in the near future." *In re Audrey S.*, 182 S.W.3d at 874 (emphasis added). Although Mother may have had the *intention* of creating a stable environment for the Child, she had not done so in the four years the Child was in foster care. While Mother testified that she would have housing and be able to manage the Child's appointments and medications, as discussed further *infra*, the record shows she has neither the resources nor the demonstrated ability to do so. As DCS notes in its appellate brief, a lack of suitable housing and financial resources to properly care for the Child "unquestionably can be deemed 'other conditions' which would subject the [Child] to neglect and prevent [his] safe return to Mother's care." *Dep't of Children's Servs. v. B.B.M.*, No. E2006-01677-COA-R3-PT, 2007 WL 431251, at *9 (Tenn. Ct. App. Feb. 9, 2007). The record also shows that the Child had a very strong bond with Foster Mother and his foster family, discussed further *infra*, and that his foster parents wanted to adopt him. Accordingly, we agree with the trial court that the continuation of Mother's relationship with the Child would greatly diminish his chances of early integration into a safe, stable, and permanent home. We affirm the trial court's conclusion that DCS met its burden to prove persistent conditions.

## 2. Best Interest

When at least one ground exists to terminate parental rights, courts must then analyze whether termination is in the child's best interest. Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider. "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3). The trial court found the following factors applicable to this case and that each weighed in favor of termination:

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
>
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
>
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
>
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

\*\*\*

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

\*\*\*

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). We have explained that the list of best interest factors are "not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Indeed, "[a]scertaining a child's best interests . . . does not call for a rote examination of each [factor] . . . and then a determination of whether the sum of the factors tips in favor of or against the parent." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994). Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "When considering the[se] factors, . . . the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

We begin by examining the factors relevant to the Child's emotional needs. *See* Tenn. Code Ann. §§ 36-1-113(i)(1)(A) (effect of termination on child's need for stability), (B) (effect of a change in caretakers on child's wellbeing), (D) (parent-child attachment with parent), (E) (visitation), (H) (parent-child attachment with other individual), (I) (child's relationship with others), and (T) (effect of parent's mental and emotional fitness on child). Concerning these factors, the trial court found that the Child is thriving in the foster parents' home. Specifically, the trial court found that the Child shared a parent-child bond with Foster Mother and Tommie P. (the "Foster Father," together with Foster Mother, the "Foster Parents"), that the Child began calling them "Mom and Dad" of his own accord, that the Child was bonded with his foster siblings, and that the Child had met his extended foster family. The trial court found that the Foster Parents ensured that the Child attended his weekly therapy appointments, that his medication was managed, and that he progressed in school under his Individualized Education Program ("IEP"). Concerning Mother's relationship with the Child, the trial court found that the "Child has had only a superficial relationship with Mother," that they "do not share a healthy and secure parental attachment," and that, while the Child "seem[s] to like Mother on their occasional

visitations[,] . . . she is more of an acquaintance or friend than a parent figure." The trial court also found that Mother's emotional fitness would be detrimental to the Child and/or prevent her from consistently and effectively providing safe and stable care and supervision of the Child. Specifically, the trial court found that Mother's own mental health difficulties "require[] her full devotion of attention to manage, and she is not capable under these circumstances of consistently and effectively providing for the care and supervision of [the] Child." Accordingly, the trial court found that termination of Mother's parental rights would have a positive effect on the Child because it would allow the Foster Parents to adopt him and provide him with the much-needed stability that he required.

The record wholly supports the trial court's findings. As discussed above, although Mother occasionally visited with the Child over the four years he had been in foster care, the visits were indeed "surface" level, preventing the Child from developing a deep parent-child attachment with Mother. Conversely, the record demonstrates that the Child is deeply bonded with the Foster Mother and loves his foster family, so much so that the Child *requested* that Foster Parents adopt him. Concerning the effect a change in caretakers would have on the Child, the record shows that it would be difficult for him to manage. The Child has specific behavioral challenges that require constant management, namely ADHD, reaction to severe stress, and a low IQ. Ms. Seaton, the Child's therapist, testified that the Child has impulsivity control issues, failure to complete tasks, poor focus, a high level of activity in most environments, and that he struggles with trauma-related stress and needs constant reassurance. She also testified that the Child has been on various medications, for which he has regular medication management appointments. It is clear from the record that the Foster Parents have consistently managed these challenges and have the resources to continue to do so. Indeed, Foster Mother's background as a social worker has undoubtedly provided her with tools to help the Child thrive. The record demonstrates that the Child's placement in the foster home helped the Child's behavior improve. Ms. Seaton testified that the Child was initially very dysregulated, but since living with the Foster Parents, he had become much more regulated. When asked what type of home the Child required to be successful and to thrive, Ms. Seaton testified:

> To the best of my assessment, I think [the Child] needs a strong support system in addition to direct parenting. For support, he needs consistent and stable and level-headed discipline and reinforcement. I think he needs an environment where there's a lot of grace, patience, and also the ability to navigate professional services.
>
> I really would think [the Child] would need involvement with mental health providers and behavioral providers long term. And he would need someone that can navigate that, keep appointments and keep all the services in place, and also advocate for him educationally as well.

Ms. Seaton believed these needs were being met in his current foster home, and that his

removal from this environment would require a long transition and would be a "bit of a setback" for him. Ms. Strahl shared a similar opinion in her testimony. Given Mother's many personal challenges, discussed *supra* and *infra*, we agree with the trial court that she would be incapable of meeting the Child's needs. We agree that these factors weigh in favor of termination.

We next consider the factors related to the physical environment of Mother and the Child. *See* Tenn. Code Ann. §§ 36-1-113(i)(1)(O) (parent's prior provision of safe and stable care to any child), (Q) (parent's commitment to providing a home that meets child's needs), and (R) (health and safety of the parent's home). The trial court found that Mother has never provided safe and stable care to the Child and has failed to demonstrate an ability and commitment to creating and maintaining a home in which the Child could thrive. For the many reasons discussed, *supra*, *see* persistent conditions discussion, the record supports these findings, and we agree that they weigh in favor of termination. As to Mother's current physical environment, the trial court noted that Mother was living in a hotel room and the "immediate physical condition of the room was not demonstrated in the record, but it's not been successfully established that it is healthy and safe[.]" The only testimony concerning the environment of the hotel room was Mother's testimony that it was one room with two beds, and that it was "safe[,] and a lot cleaner" than the trailer in which she previously resided. Given this limited testimony, we conclude that this factor weighs neither for nor against termination.

The next set of factors concerns the efforts made by Mother. *See* Tenn. Code Ann. §§ 36-1-113(i)(1)(C) (parent's continuity in meeting child's needs), (J) (parent's lasting adjustment of circumstances), (K) (parent's use of resources), (L) (DCS' reasonable efforts to assist parent), (M) (parent's sense of urgency), and (P) (parent's understanding of child's basic needs). The trial court found, and, for the many reasons discussed above, we agree, that Mother failed to demonstrate continuity and stability in meeting the Child's needs and failed to demonstrate a lasting adjustment of circumstances such that it would be safe for the Child to be returned to her. Although the trial court found that Mother demonstrated "some urgency" in seeking custody of the Child through her opposition to the termination petition, it also found that she failed to address the circumstances that led to the Child's removal, *i.e.,* an unsafe environment, and had yet to obtain stable housing in the four years since the Child's removal. For the reasons discussed above, we agree that the record supports these findings. Concerning DCS' reasonable efforts to assist Mother and her use of available resources, the trial court found that DCS had been "more than reasonable" in trying to assist Mother in making lasting adjustments. Specifically, the trial court found that DCS facilitated Mother's visitation with the Child and engaged her in multiple family team meetings. The record supports these findings. Additionally, Ms. Yeager testified that she provided Mother with the name and number of several housing options and provided Mother with other resources. Despite DCS' efforts, Mother never obtained stable housing where it was safe for the Child to be placed with her. As to whether Mother demonstrated that she understood the Child's basic needs required for him to thrive, the trial court found

that she did not. Specifically, the trial court found that Mother "continues to believe with confidence that [the] Child would be better off living with her in a hotel in an unstable situation than living comfortably with [the Foster Parents]." The trial court further found that, although Mother seemed "to recognize that [the] Child has some mental health issues that require attention, [] she seems to feel that her own status as a person grappling with mental health issues makes her better qualified to assist [the] Child." Mother's testimony supports this finding. Indeed, when asked about the level of stability and care the Child required, Mother testified:

A: I can empathize with that diagnosis because I'm also – I also have ADHD.

Q: Can you also empathize that he needs a very stable environment that is safe and secure?

A: From a parent that actually has been through the foster care system since when I was a child, yes, I get that. And I can once I'm able to provide that for him, due to my empathetic nature of being able to have to deal with it for as many years as I have.

Mother heard Ms. Seaton's testimony as to the Child's many challenges and the care and resources that he requires. Mother believed that she could provide the Child with such care despite her having no stable residence, no steady employment, and no car with which to transport the Child to his necessary appointments, all while trying to navigate her own appointments and mental health challenges. We agree with the trial court that Mother does not seem to understand the resources required to care for the Child in a manner that would allow him to thrive. This factor weighs in favor of termination.

Lastly, the trial court considered whether Mother provided more than token financial support to the Child. *See* Tenn. Code Ann. §§ 36-1-113(i)(1)(S). The trial court found that "Mother's erratic work status has made her an inconsistent source of financial support for the Child." Because there was no evidence presented concerning Mother's child support payments, or lack thereof, it was incorrect for the trial court to consider this factor.

After considering the relevant statutory factors and assessing their weight, the trial court determined that DCS proved, by clear and convincing evidence, that it was in the best interest of the Child to terminate Mother's parental rights. Upon our review of the record, we determine that the weight of the relevant factors provides clear and convincing evidence that termination is in the Child's best interest. *See In re Carrington H.*, 483 S.W.3d at 535.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's termination of Mother's

parental rights.  The case is remanded for such further proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed against the Appellant, Alexis K.  Because Alexis K. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE
